**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Civil No. CCB-09-2810 |
| v. | : | Crim. No. CCB-07-0355 |
| | : | |
| ALAN BRIAN FABIAN | : | |
| | : | |

...o0o...

**MEMORANDUM**

On May 16, 2008, Alan B. Fabian pled guilty to mail fraud in violation of 18 U.S.C. §
1341 and making and subscribing a false tax return in violation of 26 U.S.C. § 7206(1).  He now
has moved under 28 U.S.C. § 2255 to vacate his conviction and sentence.  For the following
reasons, his motion will be denied, no hearing being necessary.

**TABLE OF CONTENTS**

BACKGROUND ........................................................................................................................ 2

A.     Facts ............................................................................................................................ 2

B.     Indictment, plea agreement and guilty plea ................................................................ 9

C.     Sentencing................................................................................................................. 12

D.     Restitution ................................................................................................................. 14

E.     Forfeiture................................................................................................................... 16

F.     Motion under 18 U.S.C. § 2255 ............................................................................... 20

ANALYSIS .............................................................................................................................. 20

A.     Effect of Fabian's guilty plea.................................................................................... 21

B.     Ineffective assistance claims bearing on the voluntariness of the guilty plea ................. 22

1.     Failing to investigate, interview witnesses and engage experts..................................... 24

2.     Advising that Fabian agree to the statement of facts and plead guilty ......................... 25

3.     Failing to advise Fabian about the purported violation of the Speedy Trial Act ........... 26

4.     Failing to investigate whether a check was "mailed" ................................................ 28

5.     Failing to discover the alleged constructive amendment.............................................. 29

6.     Failing to inform Fabian about the forfeiture money judgment ................................... 32

7.     Conclusion ................................................................................................................. 34

C.    Post-plea ineffective assistance claims ............................................................. 34

   1.    Sentencing.................................................................................................. 34

   2.    Failing to appeal...................................................................................... 35

D.    Post-plea non-ineffectiveness claims ............................................................. 39

   1.    Breach of plea agreement....................................................................... 39

   2.    Prosecutorial misconduct ....................................................................... 40

   3.    Judicial misconduct................................................................................. 44

   4.    Restitution order...................................................................................... 44

   5.    Forfeiture order ....................................................................................... 47

E.    Claims of "actual innocence"......................................................................... 48

**CERTIFICATE OF APPEALABILITY** ............................................................. 50

**CONCLUSION** .................................................................................................... 51

## BACKGROUND

**A.**    **Facts**

The following facts are taken from the statement of facts attached to the plea agreement that Fabian signed on May 13, 2008 and that Judge Bennett accepted as part of Fabian's valid guilty plea on May 18, 2008.

### Offense Conduct

### Count 9 - Mail Fraud

In approximately 1998, Alan Fabian and a business partner created a limited liability company called Strategic Partners International LLC ("SPI LLC"). Fabian was the Managing Partner of SPI LLC. SPI LLC specialized in IT and activity-based costing consulting services. In July 2000, Fabian and his partner sold their ownership interests in SPI LLC to MAXIMUS, Inc. ("MAXIMUS"), a publicly traded government consulting company. SPI LLC became a wholly-owned subsidiary of MAXIMUS, a status it retained until September 2001. In September 2001, MAXIMUS merged SPI LLC out of existence. Fabian signed the Articles of Merger on behalf of SPI LLC, which explicitly stated that SPI LLC ceased to exist. On March 14, 2002, Fabian incorporated a new company called Strategic Partners International Incorporated ("SPI Inc."). He did not inform MAXIMUS that he had incorporated SPI Inc. and MAXIMUS had no ownership interest in SPI Inc. Rather, Fabian was the 100 percent owner of SPI Inc.

Beginning in approximately March 2001, Fabian caused SPI LLC and later SPI, Inc. (collectively referred to as "SPI") to enter into a series of sale-leaseback transactions of

computer equipment and software with a leasing broker, Solarcom, Inc. ("Solarcom"). Fabian specified the equipment and software that was to be the subject of each sale-leaseback transaction. Solarcom in turn located third-party funding sources for the transactions. Solarcom then purchased the specified computer equipment and software from SPI using funds made available by the funding sources and leased the equipment and software back to SPI. SPI paid three months' rent (plus tax) to Solarcom and then owed the remaining monthly payments to the funding sources. Solarcom mailed a check to SPI to purchase the equipment specified under each particular lease. The funding sources to which Solarcom directed the SPI sale-leaseback transactions between 2001 and 2004 included the following financial institutions: Deutsche Financial Services Corporation ("Deutsche"), DeLage Landen Financial Services Inc. ("DLL"), Fleet Business Credit LLC ("Fleet"), and Key Equipment Finance ("Key").

Between approximately March 2001 and June 2004, SPI obtained approximately $32,000,000 in funds from Solarcom after Deutsche, DLL, Fleet, and Key funded the sale-leaseback transactions. All $32,000,000 was deposited into SPI bank accounts over which Fabian had sole signatory authority. Between March 2001 and June 2004, Fabian caused SPI to pay approximately $3,300,000 to Solarcom and approximately $12,900,000 to the funding sources in rent payments.

In connection with the above-described sale-leaseback transactions, Fabian provided Solarcom with equipment itemization spreadsheets describing the equipment to be sold and executed various documents prepared by Solarcom. Beginning in 2003, in response to requests from Solarcom, Fabian also provided Solarcom with invoices and wire transfer advices of debit, which Solarcom transmitted to the funding sources. These documents contained material misrepresentations that Fabian made with knowledge of their falsity. With respect to most of the transactions that took place between March 2001 and the Fall of 2003, SPI did not purchase the Dell servers, laptops, and other items of hardware that it purported to sell to, and lease back from, Solarcom. One example is a sale-leaseback transaction that Fabian caused SPI Inc. to enter into on or about April 17, 2003. In that transaction, Fabian provided Solarcom with an equipment itemization form which stated that SPI had purchased 15 Dell Latitude D800 laptops at a per unit price of $4999 and four Dell Poweredge 8450 servers at a per unit price of $19,999, for a total cost of $154,981. In fact, as Fabian well knew, SPI had purchased none of the listed Dell equipment that it purported to sell to, and lease back from, Solarcom in connection with that transaction. Based on Fabian's misrepresentations, Solarcom paid SPI $154,981 for this computer hardware that SPI had not purchased.

Beginning in the Fall of 2003, Fabian caused SPI to purchase certain computer hardware from Dell, but provided fraudulent Dell quotes and invoices to Solarcom to make it appear that the items SPI had purchased were different, substantially more expensive pieces of hardware. Fabian also created fraudulent wire transfer records which reflected wire transfers from Fabian's SPI accounts to Dell that never happened. When a representative of DLL inquired of Solarcom whether the wire confirmations that Fabian presented were reflections of actual transactions, Fabian falsely stated in an email to representatives of Solarcom and DLL that they were screen-prints from his computer

captured right after the wires were executed. Recovered from Fabian's laptop that contained SPI's electronic records was a template that Fabian used to create the false Dell documentation. A template used to create fraudulent wire transfer records was also recovered from Fabian's laptop.

Between approximately June 2001 and early 2003, SPI purported to sell to, and then lease back from Solarcom, software marketed by ABC Technologies ("ABC") and SAS Institute ("SAS"). SPI never made any purchases of software from ABC or SAS. Instead, SPI purported to sell, and then lease back, licenses of software that MAXIMUS had been provided for free to use in its consulting engagements as part of a marketing agreement. In reality, these software licenses were not transferrable and could not be used by anyone other than MAXIMUS consultants.

From 2003 through 2004, SPI purported to purchase software, in arms length transactions, from Special Properties, Inc. ("Special Properties") and SMART Software USA ("SMART Software"). Fabian controlled both of these entities. Fabian misrepresented to Solarcom and the funding sources that Special Properties and SMART Software were controlled by other persons and that he had made legitimate software purchases from those entities. Although Fabian transferred money from SPI's bank accounts to bank accounts in these entities' names, which he controlled, SPI did not purchase software from either of these companies.

When asked by Solarcom about Special Properties, Fabian told Solarcom that it was controlled by another person. When asked for invoices and wire receipts to confirm software purchases from this company, Fabian provided Solarcom with false invoices and false wire receipts, which he created and then falsely claimed were provided to him by Special Properties. At that time, Fabian knew that he had incorporated a company called Special Properties, that he had opened a bank account in the name of Special Properties, and that SPI had, in fact, made no purchases of software from Special Properties.

When asked about SMART Software, Fabian misrepresented to Solarcom that it was an importer, or a sales agent of an importer, of software developed overseas from which SPI purchased software licenses. At that time, Fabian knew that SMART Software was a trade name for CMAT International Inc. ("CMAT International"), which was a for-profit entity that he controlled. Based on Fabian's misrepresentations that SPI had purchased software from SMART Software, Solarcom paid SPI almost $5,000,000 to purchase the software as part of sale-leaseback transactions.

Fabian purported to obligate MAXIMUS for payment on the leases in the event of a default. To that end, Fabian executed documents on behalf of MAXIMUS which misrepresented his authority to bind MAXIMUS. MAXIMUS was not aware that Fabian was purporting to obligate MAXIMUS on the leases, and Fabian, in fact, lacked the authority to do so.

In early 2003, DLL learned that SPI LLC no longer existed. When asked about this, Fabian told a Solarcom employee that the "LLC" was not consistent with MAXIMUS'

corporate structure so he had incorporated SPI Inc. Fabian falsely stated to the Solarcom employee that SPI Inc. remained a wholly-owned subsidiary of MAXIMUS. In or about April 2004, Fabian caused another MAXIMUS employee in his group to falsely represent to Solarcom and DLL that SPI Inc. was a wholly-owned subsidiary of MAXIMUS. With respect in particular to Count 9, on or about June 9, 2004, Fabian made several material misrepresentations in the paperwork he submitted to Solarcom for that transaction.

With respect to the hardware included in that deal, Fabian represented to Solarcom that SPI had purchased 50 Dell Poweredge servers at a per unit price of $26,422, for a total of $1,387,155. To bolster this claim, Fabian provided Solarcom with: (1) a fraudulent Dell quote, dated May 20, 2004 purporting to show that Dell had quoted the $26,422 price per server; and (2) a fraudulent wire transfer record purporting to show that SPI had wired $1,387,155 to Dell's account at Mellon Bank on May 20, 2004. No such wire transfer was made to Dell. In addition, the Dell service tags that Fabian provided to Solarcom in connection with these 50 servers corresponded to different, much cheaper servers that SPI had purchased from Dell in February 2004 and April 2004 at a per unit price of approximately $605 and $809, respectively. With respect to the software included in the June 2004 transaction, Fabian represented to Solarcom that SPI had purchased $748,125 in software licenses from SMART Software. To bolster this claim, Fabian provided Solarcom with: (1) an invoice from SMART Software dated May 20, 2004 for the supposed sale of 15 licenses each of three software programs, totaling $748,125; and (2) a fraudulent wire transfer record purporting to show that, on May 20, 2004, SPI had wired $748,125 to an account in at [*sic*] Barclay's Bank in New York in the name of SMART Software. SMART Software did not maintain an account at Barclay's Bank, and SPI did not wire or otherwise provide $748,125 to SMART Software on May 20, 2004. Based on Fabian's misrepresentations, on or about June 11, 2004, Solarcom mailed a check to SPI in Maryland in the amount of $2,033,600 for this hardware and software.

In July 2004, Fabian defaulted on 11 outstanding leases, several of which were consolidations of earlier leases. Of the $32,000,000 that SPI received from the funding sources through Solarcom, Fabian used a large sum of the money to create CMAT, Fabian also used sale-leaseback proceeds, among other things, to purchase real estate in North Carolina, to make donations to his children's private school, and to pay for private jet travel.

After the defaults, SPI Inc. was forced into bankruptcy. As part of the bankruptcy process, Fabian provided false testimony under oath at depositions in October and November 2004. Specifically, Fabian testified that, among other things, SMART Software was an overseas company based in the Netherlands and that he could not recall the name of the person at SMART Software who sent to him by email SMART Software invoices. In fact, Fabian controlled SMART Software and created the SMART Software invoices that he claimed had been emailed to him from someone in the Netherlands. He provided this false testimony in an attempt to conceal the fact that he controlled SMART Software and to make it appear that SPI had purchased software licenses from SMART Software, when in fact, it had not. Further, in order to conceal that the money Fabian

transferred from SPI Inc.'s bank accounts to his CMAT bank accounts was for his own use and not actually for the purchase of software, Fabian filed a false statement of Financial Affairs with the bankruptcy court. Fabian indicated in that document that millions of dollars transferred to CMAT was for the purchase of software from SMART Software when in fact, the transfers to CMAT were not made to purchase software.

When agents of the bankruptcy trustee attempted to verify the information Fabian provided, Fabian further attempted to conceal that he had not in fact purchased the software. To that end, Fabian caused two software vendors to create paperwork for software sales in late 2004/early 2005 that reflected that the sales took place in 2004.

## Count 25 - False Tax Return

Fabian also endeavored to conceal his income and assets from the IRS to evade the assessment of taxes on current income. In 2002, Fabian received income from SPI. Fabian failed to report at least some of that income on his Form 1040 joint individual income tax return for 2002, which he filed on or about April 15, 2003. Fabian also overstated on his 2002 tax return the amount of taxes that had been withheld by his employer(s). While he claimed withholdings of $46,425, in fact only $14,654.68 in federal tax had been withheld on behalf of him and his spouse in 2002.

In 2003, the Defendant again received income from SPI and willfully failed to report at least some portion of that income on his Form 1040 joint individual income tax return for 2003, which he filed with the IRS on or about October 15, 2004, and which was verified by a written declaration that it was made under the penalties of perjury. Fabian also willfully overstated on his 2003 tax return the amount of taxes that had been withheld by his employer(s). While he claimed withholdings of $46,000, in fact only $13,969.80 in federal tax had been withheld on behalf of him and his spouse in 2003.

On his 2004 Form 1040 joint individual income tax return, Fabian willfully overstated the amount of taxes that had been withheld by his employer(s). While he claimed withholdings of $504,000, in fact only $28,985 in federal tax had been withheld in 2004 on behalf of him and his spouse. In this way, Fabian willfully failed to pay $475,015 in federal tax that was due and owing for 2004.

## Relevant Conduct

## Provident Bank

In April 2005, on behalf of CMAT, Fabian executed a $300,000 line of credit with Provident Bank ("Provident"). Under the terms of the line of credit, Fabian was able to borrow up to 75 percent of the amount of CMAT's eligible accounts receivable. The loan was guaranteed by, among other things, all of CMAT's equipment, receivables, and inventory. Fabian executed a personal guaranty for this line of credit.

On June 27, 2006, the line of credit was increased to $1,250,000. On July 7, 2006, the line of credit was closed, and Provident extended a new line of credit in the name of CMAT International, a for-profit affiliate of CMAT, for $2,000,000. The line of credit was secured by, among other things, CMAT International's equipment, receivables, and inventory. Fabian executed guaranties on behalf of CMAT and CMAT Holdings d/b/a SMART Software. This line of credit also expanded the borrowing base to 75 percent of CMAT International's, CMAT's, and SMART Software's eligible accounts receivable, which were then all pledged as collateral. This raised CMAT's total exposure to Provident to approximately $2,700,000. On May 16, 2007, the line of credit was increased to $3,000,000. On June 29, 2007, the line of credit was again increased to $3,350,000.

To support the loan increases and the credit line generally, Fabian was required to submit borrowing base certificates with attached accounts receivable aging summary reports, which indicated the eligible accounts receivable against which he could draw down on the line of credit. Fabian created these certificates and submitted them to Provident. On each of the accounts receivable aging summary reports, Fabian indicated the names of customers who owed on invoices to CMAT, CMAT International and SMART Software, the amounts of the open invoices, and the length of time they had been open. Fabian could draw down on the line of credit up to 75 percent of the value reflected on these aging summary reports.

Between April 2005 and June 2007, Fabian made material misrepresentations in the borrowing base certificates and accounts receivable aging summary reports he submitted to Provident. For example, in the aging summary report submitted to Provident for the month ended March 31, 2006, Fabian reported that a company called QPR Trag owed a receivable balance of $220,000. On April 30, 2006, Fabian submitted an accounts receivable aging summary report and a borrowing base certificate, showing no outstanding balance for QPR Trag and no write-offs in that month. Therefore, between March and April 2006, Fabian misrepresented that QPR Trag paid $220,000, when, in fact, QPR Trag never made any payments to CMAT or any related entity. Between 2005 and 2007, Fabian represented in accounts receivable aging summary reports that QPR Trag had made approximately $1,500,000 in payments to CMAT and related entities, when, in fact, QPR Trag had made no such payments.

Between April 2005 and March 2007, Fabian also caused CMAT to borrow $1,647,000 from Provident by way of several equipment loans. In connection with these loans, Provident required Fabian to submit invoices from vendors reflecting purchases by CMAT of the financed equipment. During the life of these term loans, Fabian submitted fraudulent invoices for computer equipment from Competitive Innovations LLC ("Competitive Innovations") and Optimum Solutions Inc. ("'Optimum Solutions"). For example, for a $700,000 line of credit to finance computer equipment, Fabian submitted false invoices purporting to show that CMAT purchased computer equipment from Competitive Innovations for a total price of $938,522. CMAT never purchased any computer equipment from Competitive Innovations or Optimum Solutions.

In approximately August 2007, Provident called the line of credit and term loans. Fabian's entities were unable to pay the amounts owed, and Provident consequently sustained a loss of $4,072,000.

## Line of Credit with Wachovia Bank, N.A.

On or about March 7, 2006, Fabian caused CMAT to take out a $750,000 equipment loan with Wachovia Bank, N.A. ("Wachovia"), which was increased to $1,500,000 on April 28, 2006. Similar to the equipment term loans with Provident discussed above, Fabian submitted at least two false invoices to Wachovia purporting to show that CMAT had purchased computer equipment from Competitive Innovations. Again, CMAT never purchased any computer equipment from Competitive Innovations.

On or about April 28, 2006, Fabian caused CMAT to take out a line of credit with Wachovia for $1,000,000, which eventually increased to $1,500,000 and was secured by all of CMAT's assets. Fabian represented to Wachovia that the Wachovia line of credit would take out the Provident line of credit and that Wachovia would have a first position with respect to all of CMAT's assets in the event of a default. However, Fabian caused his entities to maintain the Provident line discussed above even as he caused CMAT to draw down on the Wachovia line of credit. On or about March 7, 2007, Fabian caused CMAT to take out an additional $250,000 loan with Wachovia for short-term working capital.

In July 2007, Wachovia called its loans and gave CMAT 90 days to make payment. CMAT was unable to make such payment, which resulted in a loss to Wachovia of approximately $3,250,000.

## Sale of SmartEdge Invoice to Interface Financial Group

On or about July 25, 2007, Fabian, on behalf of another entity he controlled, SmartEdge International, Inc. ("SmartEdge"), sold to The Interface Financial Group ("IFG") an invoice purportedly issued by SmartEdge to The Metis Group, LLC ("TMG"). The purported invoice was dated July 15, 2007, and was in the amount of $267,246. IFG purchased the invoice for a discounted price of $249,393.97 in exchange for SmartEdge assigning IFG its purported interest in payment of the full invoice amount of $267,246 from TMG on or about September 14, 2007. Fabian falsely represented to IFG that SmartEdge had fully performed all obligations giving rise to or related to the invoice; that TMG had not disputed the account receivable or underlying obligation and that the invoice was a valid enforceable obligation of TMG to SmartEdge in its entirety without defense, deduction, or set-off.

At the time that Fabian sold the SmartEdge invoice to IFG, SmartEdge had not sent that invoice to TMG for payment, and TMG did not owe SmartEdge $267,246. TMG did not have a contractual relationship with SmartEdge. Although the owner of TMG and Fabian both knew that TMG did not owe $267,246 to SmartEdge, the owner of TMG, at

Fabian's request, falsely represented to IFG that the invoice was valid and that TMG would pay IFG on the invoice in September 2007.

After agreeing to purchase SmartEdge's invoice to TMG, IFG made an initial payment to SmartEdge on the invoice to TMG of $213,796.80 on or about July 26, 2007. When IFG demanded payment from TMG of the invoiced amount of $267,246 in September 2007, TMG refused to make such payment. Pursuant to its agreement with SmartEdge and to a personal guarantee executed by Fabian, IFG then demanded that SmartEdge and Fabian repurchase for cash the invoice SmartEdge had sold to IFG. Neither SmartEdge nor Fabian made any such payment to IFG. IFG has sued TMG, SmartEdge, and Fabian in the Circuit Court for Montgomery County.

(Letter from Tonya Kowitz and Jonathan Biran to James Wyda and Sean P. Vitrano (May 12, 2008), Docket No. 73 ("Plea Agmt.").)

## B.    Indictment, plea agreement and guilty plea

On August 8, 2007, a federal grand jury returned a 23-count indictment charging Fabian with nine counts of mail fraud, in violation of 18 U.S.C. § 1341; nine counts of engaging in monetary transactions with the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1957; two counts of bankruptcy fraud, in violation of 18 U.S.C. § 157; two counts of perjury, in violation of 18 U.S.C. § 1621(1); and one count of obstruction of the due administration of justice, in violation of 18 U.S.C. § 1503. The indictment also contained a forfeiture allegation.

On November 28, 2007, the grand jury returned a superseding indictment realleging the first 23 counts from the original indictment, and adding two counts of willfully making and subscribing false tax returns, in violation of 26 U.S.C. § 7206(1); and one count of making a false statement in a matter within the jurisdiction of the Internal Revenue Service ("IRS"), in violation of 18 U.S.C. § 1001.

In early 2008, the government notified Fabian, through counsel, that it intended to seek a new indictment charging him with defrauding Provident Bank ("Provident"), Wachovia, N.A. ("Wachovia"), and Interface Financial Group ("IFG"), by pledging fraudulent accounts

receivable of The Centre for Management and Technology ("CMAT"), a company owned by the petitioner, and related entities. (Gov't Opp'n at 1-2; Sealed Bench Conference Transcript, Oct. 24, 2008 ("Sealed Oct. 24 Transcript"), at 8.)[1]  The alleged loss from that second scheme was more than $7 million. (*Id.*)  Before that second indictment was to be presented to the grand jury, Fabian pled guilty to Counts 9 and 25 of the superseding indictment. According to the government, "Because the petitioner stipulated to the facts concerning the accounts-receivable fraud scheme as relevant conduct in his plea agreement, the Government elected not to charge him in connection with that second scheme, and also did not go forward with an investigation of a third multi-million dollar fraud scheme, which involved a new sale-leaseback fraud scheme that the petitioner concocted in order to finance CMAT's operations." (*Id*. at 2.)

On May 13, 2008, Fabian agreed to plead guilty to Counts 9 and 25 of the Superseding Indictment, and signed the plea agreement quoted above. Fabian appeared before Judge Bennett for rearraignment on May 16, 2008. At the rearraignment, Judge Bennett engaged in an extended colloquy to determine whether Fabian was entering the guilty plea knowingly and voluntarily. Among many other questions, Judge Bennett asked Fabian about his legal representation:

THE COURT: Are you fully satisfied with the services of your attorneys, the Federal Public Defender for this district, Mr. Wyda, and the Assistant Federal Public Defender, Mr. Vitrano?
THE DEFENDANT: Very much so, Your Honor.
THE COURT: Are you satisfied with their representation and the advice which they've given you?
THE DEFENDANT: Yes, Your Honor.
THE COURT: Please explain to me in your own words the reason for your satisfaction.

---

[1] A portion of the sentencing hearing was conducted as a sealed bench conference. That portion of the sentencing transcript will be electronically filed, as part of the record, under seal. A copy is being supplied to counsel and Mr. Fabian, in case they do not already have it.

| | |
|---|---|
| THE DEFENDANT: | Your Honor, they've covered everything exhaustively and have investigated every opportunity and avenue in my defense and I've been totally satisfied with that. |
| THE COURT: | Is there anything you've asked either one of them to do which they've not done? |
| THE DEFENDANT: | No, Your Honor. |

(*Id.* at 5-6.)

The government summarized the statement of facts from the plea agreement, both as to offense conduct and other relevant conduct, and represented that it would be prepared to prove those facts at trial. (Plea Transcript, ECF No. 211, at 33-43.) With respect to the facts related to relevant conduct, Judge Bennett explained to Fabian: "[T]he Government is now also going to summarize facts for what is known as relevant conduct, which is conduct that I may consider when I calculate the advisory guidelines. Do you understand that as well and that's part of the statement of facts?" (*Id.* at 39.) Fabian responded, "Yes, Your Honor." (*Id.*) The following colloquy followed the government's statement of facts:

| | |
|---|---|
| THE COURT: | Thank you, Ms. Kowitz. If you'll please stand, Mr. Fabian? Mr. Wyda or Mr. Vitrano, are there any additions or modifications? |
| MR. WYDA: | No, Your Honor. |
| THE COURT: | All right. Mr. Fabian, is that an accurate summary of the facts in this case? |
| THE DEFENDANT: | Yes, Your Honor. |
| THE COURT: | Did you commit the crime as summarized by Ms. Kowitz on behalf of the United States Government and agree to each and every word of the statement of facts? |
| THE DEFENDANT: | Yes, Your Honor. |
| THE COURT: | Do you still wish to plead guilty? |
| THE DEFENDANT: | Yes, Your Honor. |
| THE COURT: | Specifically then, Mr. Fabian, how do you plead to Counts 9 and 25 of the superseding indictment, guilty or not guilty: |
| THE DEFENDANT: | Guilty, Your Honor. |
| THE COURT: | Mr. Wyda or Mr. Vitrano, is there any reason that you know of why this Court should not accept these guilty pleas? |
| MR. WYDA: | No, Your Honor. |
| MR. VITRANO: | No, Your Honor. |
| THE COURT: | It is the finding of this Court in the case of United States of America v. Alan B. Fabian, Criminal Number RDB-07-0355 that |

the defendant is fully competent and capable of entering an informed plea, that the defendant is aware of the nature of the charges and the relevant consequences of his pleas of guilty and that his pleas of guilty on the advice of competent counsel with whose services he is satisfied are knowing and voluntary pleas supported by an independent basis in fact sustaining each of the essential elements of the offenses charged. The pleas of guilty are to be accepted and the defendant is now adjudged guilty of the offense of mail fraud as set forth in Count 9 in violation of 18 United States Code, Section 1341 and guilty of making and subscribing to false tax return in violation of 26 United States Code, Section 7-2061 as set forth in Count 25 of the Indictment. A guilty finding shall be entered as to both counts.

(*Id.* at 43-45.)

At the rearraignment, Mr. Wyda also stated the following:

To the victims in this case and also to the many people here today on behalf of Mr. Fabian, Mr. Fabian and his family. We are here today four months before trial frankly because Mr. Fabian has been anxious to accept responsibility for his wrong doing because Mr. Fabian is trying as best he can to accommodate and limit the Government's expenditure of resources on this matter.

(*Id.* at 47.)

## C.  Sentencing

The case was transferred from Judge Bennett to the undersigned judge for sentencing.[2]

The court conducted a two-day sentencing hearing on October 23-24, 2008. (*See* Sentencing

Transcript, Oct. 23, 2008, ECF No. 151 ("Oct. 23 Transcript"); Sentencing Transcript, Oct. 24,

2008, ECF No. 152 ("Oct. 24 Transcript").) The government called two witnesses: James Little,

a friend and fellow churchgoer of Fabian who loaned Fabian $500,000 and was never repaid, and

Vaughn Hardin, a travel agent who fronted more than $120,000 in expenses for a vacation taken

by Fabian and his family in June 2007, but whom Fabian never repaid. Mr. Fabian's daughter

---

[2] Judge Bennett decided to recuse himself after learning of certain information proffered to the government by Fabian. Fabian has offered no evidence of improper reassignment; in any event, if he believed there was a basis to challenge reassignment to the undersigned judge, he should have raised it before sentencing.

and wife, along with his counsel, spoke on his behalf. Mr. Fabian then spoke, stating, among other things:

> I have wreaked an incredible amount of damage on Solarcom, Maximus, Provident, Wachovia, employees of CMAT, my friends and my family. . . . I never intended for any of this to turn out this way, and yet I knew during the process that things were snowballing out of control and could not continue. Rather than bring this to someone's attention, I tried to fix it all myself and in the process, just made everything worse. . . . To Maximus, Solarcom, DLL, Fleet and Key, Provident, Wachovia, Vaughn Hardin, Jim Little, I breached a trust that you placed in me, and I damaged your business and the careers of the people who worked with me. I deeply regret my actions and will carry that burden of that guilt for the rest of my life. To you, Your Honor, and to the prosecution, I apologize for the incredible amount of time and money you have had to expend on my case, when I should have just walked in and threw myself on your mercy.

(Oct. 24 Transcript at 48-49.)

The court then proceeded to sentencing. Although at the time Fabian and the government entered the plea agreement there were disputes as to the advisory guideline range, by the time of sentencing those disputes had been resolved and the parties stipulated to the applicable advisory range. (*See* Oct. 23 Transcript at 4 ("[W]e're in agreement about the Advisory Guideline range. This is going to be a discussion about 3553(a) factors.")). The court explained:

> My first duty in terms of the sentencing process that must be followed is the calculation of the Advisory Sentencing Guideline range, which then has to be taken into account. Now in this instance, there is no debate about [the range]. I am simply going to state it for the record. Count 9 is a mail fraud count, Count 25, a false tax return. The way the Advisory Guidelines work, you start with a base offense level for the mail fraud count of seven. There's an increase of 22 because the loss for Guidelines purposes is greater than $20 million. There's an increase of two because of sophisticated means being used to carry out the fraud, an increase of two because more than a million dollars was taken from financial institutions, and an increase of two because of the obstruction of justice involved here, which primarily that would be the false testimony in the document to the bankruptcy court, which brings us to a level 35. The parties agree, and the government is moving for a total of a three-level downward adjustment for Mr. Fabian's acceptance of responsibility. So that's an offense level of 32 on that count. Mr. Fabian has no criminal history, so he is a Criminal History Category I. The Advisory Guideline range for Count 9 is 121 to 151 months. Under the grouping principles, and just because of the level that the false tax return, Count 25 . . . essentially does not change that Guideline range.

(Oct. 24 Transcript at 55-56.)

After calculating the advisory range, the court moved on to the factors under 18 U.S.C. § 3553(a), and considered the nature and circumstances of the offense including the amount of the loss, Mr. Fabian's personal characteristics, deterrence, the likelihood of recidivism, the seriousness of the offense, and the need to promote respect for the law and provide just punishment. (*See* Oct. 24 Transcript at 56-62.) The court concluded:

> My weighing of these factors, the fraud, the moral blindness, the harm that has been done versus the good in his personal characteristics, the acceptance of responsibility, particularly in one aspect recently, where I believe he has earned some extra acceptance of responsibility, when I think about all of that, think about other sentences in this district and where we were with the Advisory Guideline range, I am going to go somewhat below the Advisory Guideline range.
>
> I do not agree with the government that the top of that range is necessary. I find that the reasonable range is what would be the equivalent of a one level departure, if we were talking about the Guidelines. I am going to impose a sentence on Mr. Fabian of nine years. That is 108 months in the custody of the Bureau of Prisons on Count 9.

(*Id.* at 63.) The court also imposed a concurrent sentence of 36 months on Count 25, three years of supervised release on Count 9 and a concurrent one year of supervised release on Count 25, a $100 special assessment on each count, and no fine. (*Id.*) No appeal was filed.

## D. Restitution

The plea agreement did not include an agreed-upon amount of restitution, but did state the following:

> This Court may also order [Fabian] to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The parties will notify the Court no later than 14 days before sentencing of their positions with respect to the restitution amounts due to the victims in this case. If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant agrees to take all reasonable steps to retrieve or repatriate any and all available funds and to make them available for restitution.

(Plea Agmt. at 2.)  The agreement also stated that the government would "recommend that the Court order restitution to the IRS and to other victims of the offenses and relevant conduct."  (*Id.* at 8.)

In Paragraph 9 of the plea agreement, Fabian agreed to either (1) file amended tax returns for 2002, 2003 and 2004, or (2) agree to civil tax adjustments calculated by the IRS.  The agreement did not resolve civil tax liability with the IRS, but the parties "agree[d] to recommend" that the court's restitution order reflect that (1) "any restitution payments made to the IRS should be credited against any future civil tax liabilities the Defendant is found to owe with respect to tax years 2002, 2003, and 2004" and (2) "the restitution amount owed to the IRS be reduced by any payments made by the Defendant in IRS civil proceedings relating to tax years 2002, 2003, and 2004."  (Plea Agmt. at 7.)

At the Rule 11 plea hearing, restitution was mentioned several times, including the following:

> THE COURT: Do you also understand that you may be required to pay restitution?  Do you understand that?
> THE DEFENDANT: Yes, Your Honor.
> . . .
> THE COURT: . . . And furthermore, the Government will recommend restitution to the Internal Revenue Service and to other victims of your offenses and victims of your relevant conduct.

(Plea Transcript at 9, 25.)

On November 12, 2008, the government filed a letter advising the court that the parties were "continuing to have discussions concerning restitution."  (ECF No. 132.)  On November 16, 2008, the government filed its motion for entry of a restitution order.  It provided the following dollar figures that it believed to be the "losses as a result of the defendant's unlawful conduct that are properly the subject of a restitution order":

      a. MAXIMUS, Inc. - $16,275,964.12
      b. Presidio, Inc. (formerly known as Solarcom) - $10,310,000.00
      c. De Lage Landen Financial Services, Inc. - $4,024,051.00
      d. Key Equipment Finance, Inc. - $703,485.00
      e. Provident Bank of Maryland, Inc. - $4,035,854.52
      f. Wachovia, National Association - $3,625,500.28
      g. GS Financial Network, Inc. - $213,769.80[3]
      h. Internal Revenue Service - $974,009.10

(Motion for Entry of Restitution Order, ECF No. 133, at 1-2.)  The government also represented

that "Counsel for defendant Fabian has informed the undersigned that defendant Fabian agrees

with the amounts specified in paragraph 2 above."  (*Id.* at 2.)  On January 16, 2009, the court

entered a restitution order for the amounts listed in the government's motion, for a total amount

of restitution of $40,162,633.82, with no pre-judgment or post-judgment interest accruing on

those amounts.  (Restitution Order, ECF No. 141.)  The court also ordered that Fabian pay

monthly installments of $15.00 during the period of his incarceration, and upon release make

"nominal monthly installments of $250.00," with the probation officer authorized to recommend

a modification of the payment schedule.  (*Id.*)  The court issued an Amended Judgment to reflect

the $40,162,633.82 restitution order.  (Amended Judgment in a Criminal Case, ECF No. 147.)

**E.    Forfeiture**

      The superseding indictment sought forfeiture in the amount of $32 million upon

conviction of "one or more of the offenses alleged in Counts 1-18" of the indictment.  In the plea

agreement, Fabian agreed "to forfeit to the United States all of his right, title, and interest in any

and all money, property, or assets of any kind, derived from or acquired as a result of, or used to

facilitate the commission of, the Defendant's illegal activities, including all of the properties,

accounts, and other assets listed in the Revised Protective Order of the Court dated November

20, 2007" and to "assist fully the United States in the forfeiture of [those] assets."  (Plea Agmt. at

---

[3] GS Financial Network is apparently related to IFG such that the government instructed that restitution be ordered to "GS Financial Network, Inc. c/o The Interface Financial Group."  (*See* Restitution Order, ECF No. 141 at 2.)

7.)  Fabian also "waive[d] all constitutional, legal and equitable defenses to the forfeiture of [those] assets" as well as "any rights to have any forfeiture notice included in the Superseding Indictment in this case," and agreed that the court "may enter an order directing the criminal forfeiture of [those] assets . . . at the time of sentencing."  (*Id.* at 7-8.)  The November 20, 2007 Revised Protective Order (Doc. No. 55) listed various assets that the government had shown were subject to forfeiture, including real property, financial accounts, watercraft, automobiles, and companies.

Prior to sentencing the government submitted a proposed preliminary order of forfeiture (*see* Oct. 24 Transcript at 64), which stated:

> The defendant, Alan B. Fabian, having been convicted of Mail Fraud, in violation of 18 U.S.C. § 1341; and at least $20 million having been derived directly or indirectly as proceeds as a result of the offense of which the defendant was convicted; it is hereby ORDERED, ADJUDGED, AND DECREED as follows:
> 1. A total amount of $20 million is HEREBY imposed as a money judgment against the defendant.

(Prelim. Forfeiture Order, ECF No. 116.)  Because the $20 million "no longer exist[ed] as money proceeds," the proposed order also listed various "substitute assets" pursuant to 21 U.S.C. § 853(p).  (*Id.*)

The parties agreed to the $20 million money judgment shortly before sentencing on October 24, 2008.  As Fabian's counsel has averred:

> 4.  The plea agreement ultimately signed by the parties in May 2008 left open several issues that would need to be resolved subsequently or litigated in connection with Mr. Fabian's sentencing, including several sentencing guidelines adjustments, the amount subject to forfeiture, and the amounts due to victims as restitution.
>
> 5.  Between the time Mr. Fabian entered his guilty plea on May 16, 2008, and the sentencing hearing on October 23-24, 2008, Mr. Wyda and I continued negotiations to determine whether the issues left open in the plea agreement could be agreed to prior to sentencing.  With Mr. Fabian's knowledge and informed consent, Mr. Wyda and I agreed shortly before sentencing to a forfeiture money judgment of $20 million. This amount was $12 million below the $32 million figure the Government had indicated in the

Superseding Indictment was subject to forfeiture, and Mr. Wyda and I viewed it as an important concession on the part of the Government.

(Affidavit of Sean Vitrano, Gov't Opp'n Ex. 1.)  During the sentencing hearing, the government represented that the preliminary order had been "agreed to by the parties, and Fabian's counsel stated that they had reviewed the order and were "comfortable with the order." (Oct. 24 Transcript at 64-65.)[4]  The court then entered the preliminary order, imposing a $20 million "money judgment against the defendant," "at least $20 million having been derived directly or indirectly as proceeds as a result of the offense of which the defendant was convicted." (Preliminary Forfeiture Order, ECF No. 116.)[5]  Because "the $20 million that the defendant obtained as proceeds of the offense of conviction no longer exists as money proceeds," the order also forfeited to the United States Fabian's interest in certain "substitute assets." (*Id.*)

By settlement agreement and consent motion, one of the properties subject to the preliminary forfeiture order was sold.  (*See* ECF No. 150.)  Having reached a settlement with Jacqueline Richards-Fabian, Mr. Fabian's wife, regarding her interest in the properties sought to be forfeited, the government moved on May 13, 2009 for a final order of forfeiture.  (*See* Motion for Restitution Order and Final Order of Forfeiture, ECF No. 153.)  The motion listed the assets from the preliminary forfeiture order (minus the property that was sold), including "$20,000,000 U.S. Currency." (*Id.* ¶2.)  It then stated:

> 3.  The government, the defendant, and the defendant's wife, Jacqueline M. Richards-Fabian, have agreed to the resolution of all claims to the aforementioned property, in a Supplemental Settlement Agreement attached hereto as Exhibit A.  According to the

---

[4] The full exchange with defense counsel was as follows:
> MR. WYDA:  We probably didn't need to, but we reviewed the [preliminary forfeiture] order.  We're comfortable with the order, Your Honor.
> THE COURT: In terms of the order of forfeiture?
> MR. WYDA: Yes, Your Honor.
> THE COURT: That's fine. I'll sign it when it is presented to me
(Oct. 24 Transcript, at 64-65.)

[5] As this agreement was reached "shortly before sentencing," it was "impractical" to enter the preliminary order of forfeiture in advance of sentencing.  *See* Fed R. Crim. P. 32.2(b)(2)(B).

agreement:

> (1) The vehicles, One 2007 Audi, One 2006 Audi, and One 2003 Lexus will be released to JATAP Group LLC;

> (2) Real properties, 117, 119, and 120 Ocean Boulevard West, Holden Beach, North Carolina 28462, and 887 Ocean Boulevard West, Holden Beach, North Carolina 28462, will be released to JATAP Group LLC;

> (3) $60,555.11 U.S. Currency, representing a portion of the $207,555.11 held by the Clerk of the Court for the District of Maryland will be released, by check payable to JATAP Group LLC;

> (4) $147,000 U.S. Currency, representing the remaining portion of the $207,555.11 held by the Clerk of the Court for the District of Maryland will be forfeited to the government and applied toward restitution; and

> (5) $37,500 U.S. Currency submitted to the U.S. Marshal Service on or about February 12, 2009, representing proceeds from the sale of 889 Ocean Boulevard West, Holden Beach, North Carolina 28462, will be forfeited to the government and applied toward restitution;

(*Id.* ¶ 3.)  JATAP Group LLC was an entity created and controlled by Mr. and Mrs. Fabian to purchase certain real estate properties.  (*See* Government's Second Motion To Conduct Interlocutory Sale Of Property Subject To Forfeiture, ECF No. 93, at 3.)  The motion then stated, "Because the property identified above in paragraph 2(b) through 2(j) has been addressed and disposed, the forfeiture order should only run to the money judgment in the amount of $20 million." (*Id.* ¶ 7.)  "Otherwise, the order should dispose of the specified property in accordance with the Supplemental Settlement Agreement."  (*Id.*)

The Chapter 11 Trustee in the bankruptcy proceeding involving SPI, Inc. filed an opposition to the government's motion.  The trustee's claims were procedurally defaulted, however, by his failure to assert a legal interest in the property sought to be forfeited within 30 days of the docketing of the preliminary forfeiture order.  (*See* Memorandum Opinion, ECF No. 158.)

Accordingly, on June 8, 2009, five and a half months after the entry of the preliminary order, the court issued a final Order of Restitution and Forfeiture based on the settlement agreement between Mr. and Mrs. Fabian and the government (ECF No. 159), and a supplemental order directing the distribution of the funds held by the Clerk of the Court. (ECF No. 162.) The final order, in addition to listing certain real and personal property to be released to JATAP Group LLC, ordered, "The defendant Alan B. Fabian shall pay to the United States of America a money judgment of $20,000,000." (Order of Restitution and Forfeiture ¶3.)

**F.     Motion under 18 U.S.C. § 2255**

In October 2009, Fabian filed a motion to vacate, set aside or correct sentence pursuant to 18 U.S.C. § 2255. (ECF No. 173.) The government responded and Fabian replied. Fabian moved to disqualify the undersigned judge from adjudicating his § 2255 motion, which the court denied. (ECF Nos. 172, 174.) He also has filed motions for summary judgment (ECF No. 175), discovery (ECF No. 176), and appointment of counsel. (ECF No. 177.)

<u>**ANALYSIS**</u>

Fabian has raised a raft of alleged errors in his conviction and sentence. He alleges (1) ineffective assistance of counsel, (2) constructive amendment of the indictment, (3) pre-plea and post-plea prosecutorial misconduct, (4) Speedy Trial Act violations, (5) improper empanelling of the grand jury, (6) breach of the plea agreement by the government, (7) an unlawful restitution order, and (8) an unlawful forfeiture order. He also argues that he is "actually innocent."

To state a claim for relief under § 2255, a federal defendant must prove that one of the following occurred: (1) his sentence was "imposed in violation of the Constitution or laws of the United States"; (2) the "court was without jurisdiction to impose such sentence"; or (3) the "sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

attack." 28 U.S.C. § 2255(a). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." *Id.* § 2255(b). If the prisoner succeeds in making that showing, "the court shall [1] vacate and set the judgment aside and shall discharge the prisoner or [2] resentence him or [3] grant a new trial or [4] correct the sentence as may appear appropriate." *Id.* § 2255(b).

## A. Effect of Fabian's guilty plea

A threshold issue is the effect of Fabian's guilty plea on the scope of this court's review. "When a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea." *United States v. Moussaoui*, 591 F.3d 263, 279 (4th Cir. 2010). Thus where a defendant does not challenge the jurisdiction of the court's "power to enter the conviction or impose the sentence," "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989); *see also Tollett v. Henderson*, 411 U.S. 258, 266 (1973) ("The focus of federal habeas inquiry is the nature of the advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity.").[6] Moreover, any claims of ineffective assistance of counsel concerning constitutional or statutory violations that "occurred prior to [a defendant's] guilty plea and [are] unrelated to it" are foreclosed from review. *Fields*, 956 F.2d at 1296 (citing *Tollett*, 411 U.S. at 258). Fabian does not challenge this court's jurisdiction to enter the conviction or impose the sentence. Therefore, this court's review of Fabian's claims prior to

---

[6] An exception to *Tollett* for cases where "state law permits a defendant to plead guilty without forfeiting his right to judicial review of specified constitutional issues," *Lefkowitz v. Newsome*, 420 U.S. 283, 293 (1975), is not applicable here, as Fabian's underlying criminal case was in federal court. *See also Fields v. Attorney General of State of Md.*, 956 F.2d 1290, 1295-96 (4th Cir. 1992).

entry of the plea is limited to claims that he received ineffective assistance of counsel related to his decision to plead guilty. Unless he prevails on those claims, he has waived all "nonjurisdictional defects" that preceded the plea.

**B.      Ineffective assistance claims bearing on the voluntariness of the guilty plea**

During the complex proceedings and negotiations leading to his guilty plea and sentencing, Fabian was represented by two respected, experienced members of the office of the Federal Public Defender for the District of Maryland: Federal Public Defender James Wyda, and Assistant Federal Public Defender Sean Vitrano.[7]  In their representation of Mr. Fabian, they displayed a clear knowledge and understanding of the facts of this case.  Fabian himself stated in open court, under oath, that Mr. Wyda and Mr. Vitrano had "covered everything exhaustively and have investigated every opportunity and avenue in my defense and I've been totally satisfied with that."  (Guilty Plea Transcript at 6.)  Fabian, however, now argues that Mr. Wyda and Mr. Vitrano's representation was constitutionally ineffective and undermined the voluntariness of his decision to plead guilty.[8]

Ineffective assistance claims are reviewed under the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to establish infringement of a criminal defendant's Sixth Amendment right to effective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* at 687.  Representation is deficient if it falls below "an objective standard of reasonableness," *i.e.*, was not "within the range of competence demanded of attorneys in criminal cases."  *Id.* at

---

[7] Mr. Vitrano has since entered private practice.
[8] Ineffective assistance claims are not procedurally defaulted by the failure to raise them on direct appeal. *Massaro v. United States*, 538 U.S. 500, 505 (2003).  Therefore, the reviewability of these claims is not affected by Fabian's failure to directly appeal his conviction and/or sentence.

687-88.  The standard for assessing such competence is "highly deferential" and is founded on a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Id.* at 689.  To prevail, a petitioner must overcome the presumption that the challenged action might be considered "sound trial strategy," *id.*, and must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id.* at 690.  An attorney's acts or omissions are "reviewed individually"; acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation."  *Fisher v. Angelone*, 163 F.3d 835, 852-53 (4th Cir. 1998).

To prevail on the prejudice prong, a petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  When a petitioner alleges ineffective assistance of counsel following the entry of a guilty plea, he "must show that there is a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  This is an objective inquiry, and dependent on the likely outcome of a trial had the defendant not pleaded guilty.  *Hill*, 474 U.S. at 59-60.  A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted even had the attorney's performance been deficient.  *Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

As stated above, this court may only consider Fabian's ineffective assistance claims involving actions that precede his plea insofar as they bear on the voluntariness of his decision to plead guilty to Counts 9 and 25 of the superseding indictment.  Fabian argues that his counsel's representation was deficient—and therefore his plea was not "counseled and voluntary," *Broce*, 488 U.S. at 569—for the following reasons.

### 1.  Failing to investigate, interview witnesses and engage experts

Fabian argues that his representation was deficient because in investigating conduct by Solarcom, Maximus and other entities, his attorneys "relied exclusively on the open file discovery of the government and on civil discovery depositions from 2-3 years prior to the indictment and plea."  (Def.'s Reply at 48.)  This failure to investigate, he argues, rendered his plea involuntary.  Fabian concedes that "any witness for the government would be under no obligation to speak with Petitioner's attorney."  (*Id*. at 49.)  Nonetheless, he argues that those witnesses, if interviewed or subpoenaed, would have "contradict[ed] the government's allegations."  (*Id.*)  It is not "objectively unreasonable," however, for a lawyer to assume that witnesses who testified in sworn depositions would testify consistently in a criminal trial.  Moreover, Fabian does not point to a single witness who, if interviewed, would have provided information that would have "changed the outcome of [a] trial."  *Hill*, 474 U.S. at 58.  Therefore, Fabian has shown neither that his attorneys' decision not to interview particular witnesses or subpoena particular records was deficient nor that he suffered prejudice as a result.

Fabian also argues that his attorneys should have hired an expert in sale-leaseback transactions and a financial expert on "loss" prior to advising him to take the plea, and failing to do so resulted in Fabian "agree[ing] to the Plea based on loss figures that had never been analyzed or scrutinized by defense counsel."  (Def.'s Mem. at 18; Def.'s Reply at 50.)  "A

prospect of plea bargaining, the expectation or hope of a lesser sentence, or the convincing nature of the evidence against the accused are considerations that might well suggest the advisability of a guilty plea without elaborate consideration of whether pleas in abatement . . . might be factually supported." *Tollett*, 411 U.S. at 268. Legitimate sale-leaseback transactions involve the sale and lease of actual objects, such as real estate or equipment. As Fabian admitted, most of the software and hardware that he purported to sell to and lease back from Solarcom did not exist; Solarcom entered the transactions based on "material misrepresentations that Fabian made with knowledge of their falsity." (Plea Agmt. at 13.) Fabian does not provide any persuasive reason why, if his attorneys had retained an expert on legitimate sale-leaseback transactions, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Therefore, these ineffective assistance claims fail.

### 2. Advising that Fabian agree to the statement of facts and plead guilty

Fabian also argues that his attorneys were deficient in recommending that he agree to the statement of facts and plead guilty. At the time the plea agreement was negotiated between the government and Fabian's counsel, the government advised him that it was planning to present an additional indictment charging him with a $7 million fraud, and was further investigating the existing mail fraud charges and believed the loss from that fraud was nearly $40 million, far higher than the $20 million to which Fabian agreed in the statement of facts. Moreover, the government's agreement to stipulate to the amount of loss and the three-level decrease for acceptance of responsibility was contingent on Fabian agreeing to plead guilty and stipulate to the statement of facts. In short, Fabian received a substantial benefit for pleading guilty and agreeing to the statement of facts in the plea agreement. "[A]n assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial [is] clearly

relevant to the determination of whether an attorney acted competently in recommending a plea." *Panuccio v. Kelly*, 927 F.2d 106, 109 (2d Cir. 1991). Given the deference to counsel dictated by *Strickland*, counsel's advice to Fabian to accept the plea offer and agree to the statement of facts, including those concerning relevant conduct, was not objectively unreasonable.

### 3. Failing to advise Fabian about the purported violation of the Speedy Trial Act

Fabian argues that his rights under the Speedy Trial Act were violated, and because his attorneys did not challenge these violations or inform him of them, and because knowing of the violations "may have put Mr. Fabian in a better negotiating position with the USA," his plea was involuntary. (Def.'s Mem. at 18.) Although his claim for the alleged violations themselves was waived by pleading guilty, his claim of ineffective assistance based on the failure to seek dismissal of the superseding indictment was not.

In October 2007, the government filed a motion to exclude time under the Act for various reasons, including that the government intended to seek a superseding indictment adding tax charges in November 2007. On October 16, 2007, Judge Garbis granted the motion. On November 21, 2007, Judge Bennett signed another Order excluding all time from November 21, 2007 until September 8, 2008, the agreed-upon trial date, under the Act. (*See* Order Granting Defendant's Motion to Exclude Time Under the Speedy Trial Act, Docket No. 58.) On November 28, 2007, the grand jury returned the superseding indictment. On May 16, 2008, Fabian pled guilty. Fabian argues that when the grand jury returned the superseding indictment, Judge Bennett's order excluding time under the Act was no longer effective; to continue to exclude time, a new order was required, and because more than 70 days passed between the superseding indictment and his plea, his tax-related charges should have been dismissed.

This claim fails for various reasons. None of the cases Fabian cites stand for the

proposition that an existing court order excluding time under the Act becomes ineffective upon the filing of a superseding indictment. Although various cases state that a superseding indictment that adds new charges "restarts the speedy trial clock" with respect to the new charges, *see United States v. Lesczynski*, 86 F. App'x 551, 554 (4th Cir. 2004) (cited in Def.'s Mem. at 51); *see also United States v. Alford*, 142 F.3d 825, 829 (5th Cir. 1998), that does not necessarily mean that a court's prior determination that excluding time under the Act serves the "ends of justice," 18 U.S.C. § 3161(h)(7)(A), does not apply to new counts charged in a superseding indictment. Rather, an "ends of justice" exclusion is intended to cover any of various circumstances, including where, as here, a case is particularly complex, *id.* § 3161(h)(7)(B)(ii), counsel needed additional time for effective preparation, *id.* § 3161(h)(7)(B)(iv), and/or the government and the defendant are engaged in ongoing plea negotiations. *United States v. Ford*, 288 F. App'x 54, 58 (4th Cir. 2008) ("[D]elays resulting from plea negotiations . . . are excludable.") (citing *United States v. Bowers*, 834 F.2d 607, 610 (6th Cir. 1987); *United States v. Montoya*, 827 F.2d 143, 150 (7th Cir. 1987)); *United States v. Van Someren*, 118 F.3d 1214, 1218 (8th Cir. 1997) ("A number of circuits have determined that time expended on plea negotiations is excludable[.] . . . For example, in *United States v. Montoya,* 827 F.2d 143 (7th Cir. 1987), the Seventh Circuit held that the plea bargaining process can 'qualify as one of many "other proceedings" under the generic exclusion of section 3161(h)(1).' *Id.* at 150."). Those concerns were only heightened, not diminished, when the grand jury returned the superseding indictment with additional charges. Finally, even if there were a Speedy Trial Act issue with the tax-related charges, it is entirely speculative that the dismissal of those charges would have "put Mr. Fabian in a better negotiating position with the USA." There were nearly two dozen additional charges in the original indictment to which the

government could have insisted that he plead guilty, and the government could have, and appears to have intended to, bring new charges based on a different allegedly fraudulent scheme. Therefore, these alleged errors did not reflect deficient representation or cause prejudice.

### 4. Failing to investigate whether a check was "mailed"

Fabian argues that he never committed mail fraud because Solarcom "never used the mails at all in its dealings with SPI, Inc." (Def.'s Mem. at 34.) Because the "mails" were never used, he argues, and because his counsel allegedly did not "discover" this fact, his plea was involuntary. In the statement of facts Fabian admitted, however, that "on or about June 11, 2004, Solarcom mailed a check to SPI in Maryland in the amount of $2,033,600 for this hardware and software." (Plea Agmt. at 15.) He also admitted, "I have reviewed the foregoing statement of facts with my attorney, understand it, agree with it, and do not wish to change any part of it. I further understand that it is included as part of my plea agreement with the government in this case." (*Id.* at 19.) Moreover, during the government's summary of the facts at the rearraignment, Ms. Kowitz stated, "Solarcom mailed a check to SPI in Maryland in the amount of $2,033,600 for this hardware and software." (Plea Transcript at 37.) When asked whether the government's statement was "an accurate summary of the facts in this case," Fabian responded in the affirmative. (*Id.* at 43-44.)

"[A]llegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and patently frivolous or false." *United States v. Lemaster,* 403 F.3d 216, 221 (4th Cir. 2005) (internal quotation marks omitted). "[A] district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the

sworn statements." *Id.* at 222. Because Fabian admitted that the June 11, 2004 check was transmitted through the mail, this claim of ineffective assistance fails.

## 5. Failing to discover the alleged constructive amendment

Fabian argues that the superseding indictment was constructively amended in violation of the Grand Jury Clause of the Fifth Amendment. Although his underlying alleged constitutional violation was "nonjurisdictional" and therefore was waived by his guilty plea, *see Moussaoui*, 591 F.3d at 279, he also argues that because his attorneys did not discover the alleged violation and inform him of it before he pled guilty, his plea was involuntary. The court need not decide whether the indictment was constructively amended or, if so, whether counsel's failure to discover the alleged error constituted deficient representation, because in any event Fabian did not suffer prejudice as a result.

"A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Floresca,* 38 F.3d 706, 710 (4th Cir. 1994) (en banc). Moreover, "a statutory aggravating circumstance constitutes an offense element for purposes of conviction and sentence." *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000). Thus when a statute defines two versions of an offense, one of which includes an additional aggravating element that increases the maximum statutory penalty, the aggravated offense constitutes an offense distinct from the non-aggravated offense. This distinction applies to whether the aggravated offense was charged in an indictment, because every element of an offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 232 (1999).

The mail fraud statute thus defines two distinct offenses: ordinary mail fraud, punishable by a maximum 20 years imprisonment, and mail fraud that "affects a financial institution," punishable by a maximum 30 years imprisonment. 18 U.S.C. § 1341. The prior is a Class C felony, 18 U.S.C. § 3559(a)(3) (maximum term of imprisonment of less than twenty-five years but ten or more years); the latter is a Class B felony. *Id.* 18 U.S.C. § 3559(a)(2) (maximum term of imprisonment of twenty-five years or more). Fabian argues that he was indicted for the former but pled guilty to the latter, thereby constructively amending the superseding indictment in violation of the Grand Jury Clause of the Fifth Amendment, and his counsel's failure to discover the constructive amendment rendered his plea involuntary.

The court need not address whether the plea agreement constructively amended the superseding indictment, or whether his counsel's failure to discover the alleged amendment was deficient, because he has not shown "a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see Strickland*, 466 U.S. at 697. Although the statutory maximum term of imprisonment for the two offenses differs, Fabian was sentenced well below the lower of the two maximums.[9] The base offense level for the offenses under the Sentencing Guidelines is also the same: level 7. *See* U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2B1.1(a)(1) (2008). Thus deleting the "affected a financial institution" element from the section of the plea agreement reciting the elements of Count 9 would not have altered the calculation of the advisory guideline range.

---

[9] For this reason, Fabian's citation to *United States v. Cordoba-Murgas*, 422 F.3d 65 (2d Cir. 2005) is unavailing. In *Cordoba-Murgas*, one of the defendants was indicted for possession with intent to distribute and distribution of an unspecified quantity of cocaine and crack cocaine. *Id.* at 67. In the plea agreement, the defendant admitted to having possessed with intent to distribute and distribution of between 15 and 50 kilograms of cocaine. *Id.* The district court sentenced the defendant to 262 months (21 years, 10 months) based on that quantity, which resulted in a sentence above the statutory maximum term of imprisonment of 20 years that would apply to an unspecified quantity. *Id.* at 69. The Second Circuit vacated the sentence because the defendant had not been indicted for the crime with the higher statutory maximum. *Id.* at 72. Fabian's sentence was 9 years—far less than the 20 years he could have received for the crime of mail fraud as originally charged.

Moreover, the upward adjustment of two points that applied because the defendant "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense," U.S.S.G. § 2B1.1(b)(14)(A) (2008), does not change the analysis.[10]  In the plea agreement, Fabian agreed that he had "derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense."  (Plea Agmt. at 5.)  He stipulated that in his dealings with Solarcom, after he identified the purported equipment and software that was to be sold and leased back, Solarcom purchased the specified (though usually non-existent) equipment and software "using funds made available by the funding sources" and "mailed a check to SPI to purchase the equipment specified under each particular lease."  (Plea Agmt. at 12.)  Fabian also stipulated that the "funding sources" included three "financial institutions: Deutsche Financial Services Corporation ('Deutsche'), DeLage Landen Financial Services Inc. ('DLL'), Fleet Business Credit LLC ('Fleet'), and Key Equipment Finance ('Key')."  (Id.)  The Guidelines define "financial institution" as not only institutions covered by 18 U.S.C. § 20, which defines the term for purposes of the mail fraud statute, but also as any institution described in 18 U.S.C. "§ 656, § 657, § 1005, § 1006, § 1007, or § 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund," as well as any of several other types of institutions.  U.S.S.G. § 2B1.1 cmt. n.1 (2008).  It is difficult to see how Fabian could have argued that the funding sources were not financial institutions under the broad definition in the Sentencing Guidelines.  The upward adjustment would have applied regardless of whether he was pleading guilty to ordinary mail fraud or mail fraud that affects a financial institution.

_____

[10] Although the plea agreement cites U.S.S.G. § 2B1.1(b)(13)(A), the subsection designation of the "financial institutions" upward adjustment prior to 2008, it is clear that the parties intended to refer to § 2B1.1(b)(14)(A) (2008).  The version of the Guidelines that applies in a particular case is the version in effect on the date the defendant is sentenced.  U.S.S.G. § 1B1.11(a).

Furthermore, the government apparently considered Fabian's stipulation that Deutsche, DLL and Key were "financial institutions" for purposes of the upward adjustment to be a prerequisite for the government agreeing to the deal, and Fabian and his counsel apparently concluded that stipulating to that adjustment was in Fabian's interest.

Finally, the court's ultimate sentence was within the guideline range that would have applied even absent the two-level upward adjustment. The advisory guideline range with the upward adjustment was 121-151 months (total offense level 32). The range without the adjustment was 97-121 months (total offense level 30). The court's ultimate sentence was 108 months. Moreover, the sentencing guidelines are advisory, and the court reached its decision to impose a 108-month sentence based on a consideration of all the facts agreed to in the plea agreement, along with the testimony and materials presented in connection with sentencing, within the framework of 18 U.S.C. § 3553(a).

For all of these reasons, Fabian has not shown that, even if the superseding indictment was constructively amended, there is a "reasonable probability," *Hill*, 474 U.S. at 59, that he suffered prejudice as a result. Therefore, this ineffectiveness claim fails.

### 6. Failing to inform Fabian about the forfeiture money judgment

Fabian argues that his attorneys failed to inform him that by signing the plea agreement he could be subject to the $20 million money judgment that was eventually imposed on him by the final order of forfeiture and restitution. (*See* Order of Restitution and Forfeiture, ECF No. 159.) The plea agreement did not place a dollar figure on the amount of forfeiture. Rather, it stated that by signing the plea agreement, Fabian was agreeing "to forfeit to the United States all of his right, title, and interest in any and all money, property, or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the Defendant's illegal

activities." (Plea Agmt. at 7.) Fabian also admitted that SPI had received $32 million from the funding sources, through Solarcom, to fund the sale-leaseback scheme. (*Id.* at 15.) By signing the agreement, Fabian attested: "I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it." (*Id.* at 11.) He also attested: "I have reviewed the foregoing statement of facts with my attorney, understand it, agree with it, and do not wish to change any part of it." (*Id.* at 19.) At the rearraignment, Judge Bennett asked Fabian numerous questions to ensure that he had reviewed the plea agreement and was entering it voluntarily and knowingly. (*See* Plea Transcript at 6-45.) Among the many questions Judge Bennett asked was whether Fabian was aware that "at the time that you are sentenced, there will very likely also be an order that I enter with respect to the forfeiture of assets" based on the financial disclosure statement Fabian would be required to submit "identifying all assets derived from or acquired as a result of or used to facilitate the commission of any conduct referred to in the factual stipulation." (*Id.* at 22-24.) Fabian responded in the affirmative. (*Id.* at 24.)

By agreeing to forfeit all money or other property "derived from or acquired as a result of, or used to facilitate the commission of" his illegal activities, and agreeing that SPI received $32 million as a result of his fraudulent scheme, Fabian demonstrated that he was aware he could be ordered to forfeit property up to $32 million. As noted above, "allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and patently frivolous or false." *Lemaster,* 403 F.3d at 221. Accordingly, his claim that he was not aware that he could be ordered to forfeit $20 million, an amount $12 million lower than the amount he admitted SPI received as a result of his illegal activities—a decrease his counsel later described as "a concession [from the government] during plea negotiations" (Letter from Sean Vitrano to Alan Fabian (Aug. 11, 2009), Def.'s

Mem. Ex. D)—will be dismissed.

### 7. Conclusion

For these reasons, Fabian's claims that ineffective assistance of counsel rendered his guilty plea involuntary fail. Therefore, review of all "nonjurisdictional defects" preceding the entry of his guilty plea were waived by his plea, including his claims of deficiencies in the empanelling of the grand jury, *see Tollett*, 411 U.S. at 266 (holding that a valid, voluntary guilty plea "forecloses independent inquiry" into claims related to the composition of a grand jury); violations of the Speedy Trial Act, *see Washington v. Sobina*, 475 F.3d 162, 166 (3d Cir. 2007) (citing cases)[11]; and alleged prosecutorial misconduct preceding his guilty plea.

### C. Post-plea ineffective assistance claims

Fabian also argues that his counsel's performance subsequent to the plea, both related to conduct at sentencing and in failing to appeal, was deficient.

### 1. Sentencing

Fabian argues that several of his attorneys' strategic decisions at sentencing rose to the level of ineffective assistance of counsel. He argues that his counsel was deficient because they did not retain an expert to determine the amount of loss for sentencing purposes (which he believes was "at most" $2 million, *see* Def.'s Mem. at 36) and did not call live witnesses at sentencing. Based on the facts presented, this alleged conduct does not fall below "the range of competence normally demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 688. Rather, it reflects the type of strategic decisions that are granted a high degree of deference.

He argues that his counsel failed to meaningfully cross-examine the witnesses the government presented at the sentencing, and that, if they had, their questions would have

---

[11] Fabian's separate claim arguing that his attorneys' failure to move to dismiss the new charges in the superseding indictment based on the Speedy Trial Act constituted ineffective assistance of counsel, thereby rendering his plea involuntary, is considered separately above.

revealed that both witnesses committed perjury.  Mr. Vitrano did, however, cross-examine both witnesses.  (*See* Oct. 23 transcript at 22-29, 39-49.)  Insofar as his counsel chose to cross-examine on some issues and not on others, "strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengable." *Strickland*, 466 U.S. at 690.  Further, Fabian has not shown that if his counsel had asked different questions, his sentence would have been reduced.

He also argues that his counsel should not have agreed to two guidelines enhancements that raised his adjusted offense level.  Fabian has pointed to no grounds, however, on which he or his counsel could have objected to those guidelines enhancements.  He admitted that the intended loss of the offense conduct and relevant conduct was over $20 million, and also admitted the facts necessary to show that he obstructed justice.  Moreover, by agreeing to accept the plea offer, Fabian received the benefit of not being indicted for a separate alleged fraud scheme as well as the government stipulating to a lower total loss amount than it believed it could otherwise prove at trial.  Therefore, these ineffective assistance claims fail.

## 2.  Failing to appeal

Finally, Fabian argues that his attorneys were deficient because they did not file a notice of appeal.  Whether an attorney's failure to file an appeal constitutes ineffectiveness of counsel turns on a series of inquiries.  The first question is whether a defendant unequivocally instructed his attorney to file a notice of appeal.  If an attorney "fails to follow his client's unequivocal instruction to file a notice of appeal," his performance is constitutionally ineffective, "even though the defendant may have waived his right to appeal." *United States v. Poindexter*, 492 F.3d 263, 273 (4th Cir. 2007); *see also United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000 ("An attorney who fails to file an appeal after being instructed by his client to do so is per

se ineffective.").  The probability of success on appeal is then irrelevant.  *United States v. Peak*, 992 F.2d 39, 42 (4th Cir. 1993).

If the defendant did not unequivocally instruct his attorney to appeal, the question becomes whether defense counsel "consulted with the defendant about an appeal."  *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000).  The term "consult" in this context carries a "specific meaning," namely "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes" about whether to appeal.  *Id*.  If counsel has adequately consulted with the defendant about whether to appeal, "the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal."  *Id*.  That is, if an attorney satisfies the obligation to "consult," then the onus is on the defendant to expressly instruct the attorney to file a notice of appeal.  If the defendant does not expressly instruct the attorney to appeal, then a subsequent failure to appeal does not constitute constitutionally ineffective assistance of counsel.

On the other hand, if counsel did not "advis[e] the defendant about the advantages and disadvantages of taking an appeal, and mak[e] a reasonable effort to discover the defendant's wishes . . . the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant itself constitutes deficient performance."  *Id*.  This inquiry turns on whether (1) "a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal)," or (2) "this particular defendant reasonably demonstrated to counsel that he was interested in appealing."  *Id*. at 480.  In other words, a failure to consult is not necessarily constitutionally unreasonable; rather, the question requires considering "all the information counsel knew or should have known" at the time a notice of appeal would have had

to be filed.  *Id.*  "[A] highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings."  *Id.*  Only if a rational defendant would want to appeal or the particular defendant "reasonably demonstrated to counsel that he was interested in appealing" does counsel's subsequent failure to appeal constitute ineffective assistance of counsel.  *See id.*

Fabian describes his alleged communications with his counsel concerning an appeal as follows:

> After the [sentencing hearing on October 24, 2008], Mr. Fabian, Mr. Wyda, and Mr. Vitrano went to process paperwork in the U.S. Marshall's [*sic*] office.  At this time, Mr. Wyda told Mr. Fabian he would see if there were grounds to appeal the sentence.  A short while later back at Mr. Wyda's office, Mr. Wyda told Mrs. Fabian that he would review the grounds to appeal.  Mr. Fabian never heard from Mr. Wyda again.[12] . . .

> Early in the week of October 27, 2008, Mr. Fabian, after reviewing the Plea Agreement, contacted Mr. Vitrano to tell him the Plea Agreement preserved his right to appeal his sentence since the sentence was not below a level 28 sentence pursuant to the U.S. Sentencing Guidelines.  Mr. Vitrano said if he filed an appeal he would have to file an Anders brief.  Mr. Fabian asked what an Anders brief was.  Mr. Vitrano said it was a brief saying the appeal had no merit or was groundless.  Mr. Fabian asked how he could make this determination without investigating the issues he raised.  Mr. Vitrano said he would speak to Mr. Wyda.  Mr. Fabian did not hear back from Mr. Wyda and a Notice of Appeal was not filed.

(Def.'s Mem. at 53.)  He also points to the following email he wrote to Mr. Vitrano and Mr. Wyda the following week:

> Sean and Jim,

> I would like to discuss an appeal to try and get a lower sentence.

> Per the plea agreement, I only waived my right to an appeal [if] the sentence was below a level 28 which is 78-97 months. . . .  Also, I would like to appeal under the Parsimony Provisions of 3553(a) that the sentence is "greater than necessary" to meet those purposes

---

[12] Mrs. Fabian also avers: "After sentencing on October 24, 2008, when I personally asked Mr. Wyda about an appeal Mr. Wyda said to me that they were going to look into an appeal and both Mr. Fabian and I expressed our desire to appeal."  (Declaration of Jacqueline Richards-Fabian, Def.'s Ex. A, ¶ 7.)

in particular, deterrence and incapacitation and the need to avoid unwarranted sentencing disparity.

> Also, the government knowingly put Vaughn Hardin and Jim Little on the stand and they lied. Sean dealt with Jim Little's lie but Vaughn Hardin did not arrange my flight for the arraignment. I had netjets take me up to that and back. He did not. He arranged a trip for me to meet with my banks and this was after I informed him of the indictment not before. I paid for that flight. We have the emails to document this and I told Sean during the hearing. The judge I believe relied on these guys in her decision and thinks I took advantage of them. In addition, I think the government violated my rights in releasing the sealed memo and there should be something for that and the judge didn't consider any of that.

(Email from Alan Fabian to Sean Vitrano and James Wyda (Oct. 29, 2008), Def.'s Reply Ex. B.)

Mr. Vitrano responded:

> Alan, see below. I don't think there is any basis to challenge the amounts, and we waived the right to challenge the inclusion of the Provident and Wachovia losses at the hearing after Judge Blake signaled that she might punish you more severely if we pursued that defense. . . .

(Email from Sean Vitrano to Alan Fabian (Nov. 4, 2008), Def.'s Reply Ex. E.)[13] These emails and Mrs. Fabian's affidavit are the full extent of the evidence in the record on the communications between Mr. Fabian and his counsel about whether to appeal his conviction.

Fabian does not contend, or point to any evidence, that he unequivocally instructed his attorneys to appeal his conviction. Rather, he argues that his attorneys were constitutionally ineffective because they "did not consult Mr. Fabian as defined by the Supreme Court in Flores-Ortega" and did not "conduct an appropriate review for meritorious issues for appeal." (Def.'s Mem. at 55.) Fabian admits, however, that Mr. Vitrano spoke to him about the possibility of an appeal, and that Mr. Vitrano informed him that there were no meritorious issues for appeal, and that if he and Mr. Wyda were to file an appeal, they would be constrained to file an *Anders* brief. Fabian has not shown that his counsel's advice that there were no meritorious issues for appeal

---

[13] Apparently, Mr. Vitrano was referring to the portion of the sealed bench conference at which the court expressed surprise that a challenge to the restitution amounts would be raised "at this time," *i.e.*, the morning of sentencing.

was erroneous, or that his counsel's general advice concerning appeal was otherwise deficient. In short, the record shows sufficient consultation by experienced counsel, and no subsequent instruction by Fabian—indeed no instruction at all—that they should file an appeal on his behalf. Therefore, Fabian has not shown that his failure to appeal was the result of deficient representation.

## D.     Post-plea non-ineffectiveness claims

In addition to the claims above, Fabian raises various claims other than ineffective assistance of counsel based on alleged errors subsequent to his guilty plea. Fabian did not appeal his conviction or sentence. Ordinarily, his failure to appeal and raise his post-plea non-ineffectiveness claims on appeal would preclude their review in this § 2255 proceeding, because "to obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168 (1982). Fabian has not shown "cause" for his failure to appeal because, as discussed above, he has not shown that his failure to appeal was the result of ineffective assistance of counsel. But even if he had, his claims fail on the merits, for the reasons stated below.

### 1.    Breach of plea agreement

Fabian argues that the government breached the plea agreement in two ways. First, he argues that the government breached by failing to reiterate certain language from the plea agreement in its motion for an order of restitution. Fabian has pointed to no conduct by the government that constituted a breach of the plea agreement. Paragraph 9 of the plea agreement articulated the parties' joint request with respect to any restitution Fabian would be ordered to

make to the IRS.  Although the government's motion for a restitution order did not reiterate that recommendation, neither did it contradict that recommendation.

Second, Fabian argues that the government breached the plea agreement by seeking a $20 million money judgment as part of the criminal forfeiture in the case.  In the forfeiture section of the plea agreement, Fabian expressly agreed "to forfeit to the United States all of his right, title, and interest in any and all money, property, or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the Defendant's illegal activities."  (Plea Agmt. at 8.)  The government was not obligated under the plea agreement to limit the amount of forfeiture it would seek.  Therefore, the government did not breach the agreement.

## 2. Prosecutorial misconduct

Fabian argues that his Due Process rights were violated because of alleged prosecutorial misconduct subsequent to his guilty plea.  "[T]he test for reversible prosecutorial misconduct generally has two components: that (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial."  *United States v. Chorman*, 910 F.2d 102, 103 (4th Cir. 1990).  With respect to the prejudice prong, several factors are relevant: "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters."  *United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983).  Although *Chorman* and *Harrison* involve claims of prosecutorial misconduct during trial, the standards are instructive in assessing claims of misconduct in connection with sentencing.

First, Fabian alleges that the government suborned perjury in connection with the testimony of James Little at the sentencing hearing. (*See* Def.'s Mem. at 30-31.) "A conviction acquired through the knowing use of perjured testimony by the Government violates due process." *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). "This is true regardless of whether the Government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected." *Id.* Little, a friend of Fabian, testified at the sentencing hearing about a $500,000 loan that he made to CMAT, the for-profit company Fabian controlled, which Fabian never repaid. (*See* Oct. 23 Transcript at 30-50; Plea Agmt. at 14.)[14] Little testified that the loan "c[a]me about" when the two men were attending an Orioles baseball game in "late July 2007," when Fabian told him that CMAT needed a "bridge loan" until a purported municipal bond issue would go through, about three months later. (Oct. 23 Transcript at 31-32.) Little offered to make the loan to Fabian himself. (*Id.*) Fabian has submitted an email exchange that purports to show that the baseball game occurred on July 27, 2007. (*See* Def.'s Mem., Ex. O at 6.) Little had already executed the promissory note by that date. As the government stated in its sentencing memorandum, Fabian had drafted the note, set to mature in approximately three months, "a few days prior to July 25, 2007" (Gov't Sentencing Memo., ECF No. 97, at 16; Oct. 23 Transcript at 33-34), and Little executed the note on July 25, 2007. (*Id.* Ex. 12.) At sentencing, the government argued that the timing of the loan was significant, because he took out the loan "from a church member and friend" "just before his indictment, and when he was certain to have known he would be indicted." (Oct. 23 Transcript at 61.)

---

[14] At some point Jackie Fabian sent Little a check for $1,000, but Little did not cash it because he and his wife "didn't want anyone to think that we were accepting a thousand dollars in lieu of our $500,000, plus the 9 percent interest, which is about $45,000 a year." (Oct. 23 Transcript at 36.) Otherwise, Fabian did not attempt to repay any of the $500,000 loan. (*Id.*)

Fabian does not dispute that Little made him a $500,000 loan, and that Fabian never repaid Little. Nor does he dispute any of the details surrounding the drafting and signing of the promissory note. Rather, he argues that Little misrepresented the timing of the loan, that the government knew the loan had already been made by July 27, 2007, and that he was prejudiced because the government "desired to convince the judge that Mr. Fabian solicited funds once he knew that an indictment was pending but had been deferred after Mr. Fabian's [prior] counsel met with the Government in the afternoon of July 24, 2007." (Def.'s Mem. at 30.)

There are three fatal flaws with Fabian's argument. First, he points to no evidence that the government knew the date of the baseball game at the time of sentencing. Indeed, he does not even argue that the government could have known the date of the game. Thus he has not shown that the government "solicited testimony it knew or should have known to be false." *See Kelly*, 35 F.3d at 933. Second, even assuming he is correct that the game occurred on July 27, 2007, he points to no evidence that Little's description was anything other than a general recollection of the sequence of events during the week of Monday, July 23 to Friday, July 27, 2007. Third, Fabian's argument turns entirely on his implied assertion that he had no idea he was going to be indicted until his original counsel, David B. Irwin, "met with the Government in the afternoon of July 24, 2007." (Def.'s Mem. at 30.) At sentencing, the government did not argue that the loan was made after a meeting between Fabian's counsel and the government, but rather simply that by late July 2007, after Fabian had been engaged in fraudulent schemes for over six years, "he was certain to have known he would be indicted." (Oct. 23 Transcript at 61.) It strains credulity to argue that, even in late July 2007, Fabian would not have realized he would soon be indicted. Therefore, the government's conduct was not improper.

Second, Fabian argues that at the sentencing hearing the government misrepresented the

testimony of Vaughn Hardin, the travel agent Fabian used to arrange travel to Egypt and Israel in June 2007. Hardin testified that in March 2007 Fabian approached him about retaining the services of Hardin's company, Hardin & Associates. (Oct. 23 Transcript, at 8-9.) They reached a retainer agreement under which Fabian would pay a $10,000 per year retainer in exchange for ten hours per month of "personal assistant services" and reduced fees on other travel services. (*Id.* at 10.) One of those services was an "invoice travel arrangement" through which Hardin & Associates would not only arrange travel plans, but would also "pay for everything along the way that [they] are able to pay for and then invoice the client when they get back with a service fee attached to it." (*Id.*) After signing the retainer agreement, Fabian sent Hardin a check for $2,500, the retainer payment for the first quarter of 2007. (*Id.* at 9.) Fabian engaged the company's invoice travel services for their June 2007 trip to Egypt and Israel, for which the company expended $125,750.79. (Gov't Sentencing Memo, Ex. 11.) Hardin sent Fabian an invoice for that amount on July 16, 2007. (*Id.*) Fabian never paid the bill. (Oct. 23 Transcript, at 20.) In its argument on sentencing, the government stated:

> I understand that Mr. Vitrano attempted to show that perhaps Mr. Fabian never intended for Mr. Hardin to suffer the losses that he did. I submit to the Court that it is not disputed that Mr. Fabian knew that he was under investigation in June of 2007, and that perhaps the investigation was soon coming to an end. At that time, Mr. Fabian took a vacation, a very expensive vacation, and failed to repay Mr. Hardin.

(*Id.* at 61.)

Fabian does not dispute that he used Hardin's services, took the trip in June 2007, and never paid Hardin for those services. (*See* Def.'s Mem. at 30-31.) He asserts, however, that the government "conveyed to the Court that Mr. Fabian intentionally lied to Mr. Hardin after indictment to avoid paying him." (*Id.* at 31.) But that is not what the government argued. It simply argued that in June 2007, when he "knew that he was under investigation," he took an

43

expensive vacation for which he never paid.  For these reasons, the government neither suborned perjury nor misrepresented the record during Fabian's sentencing.

Third, Fabian argues that the government disclosed sealed documents as exhibits to its unsealed sentencing memorandum, and when it sent other sealed documents via email to a reporter for the Washington Post.  (*See* Def.'s Mem. at 32.)  He has pointed to no evidence, however, that either disclosure was anything other than inadvertent.  Moreover, at sentencing his counsel acknowledged that the disclosure to the Washington Post had been inadvertent.  (Sealed Oct. 24 Transcript at 1.)  Therefore, Fabian has not shown that these disclosures were improper.

For these reasons, the court rejects Fabian's claims of prosecutorial misconduct.

### 3.  Judicial misconduct

Fabian argues that this court relied exclusively on its "religious/moral beliefs" in determining the sentence, which violates the Due Process Clause.  (Def.'s Mem. at 49.)  As evidence, he argues that the court never issued a Statement of Reasons.  The court did, however, issue a Statement of Reasons; that document is sealed in accordance with standard practice. Moreover, Fabian and his counsel had ample opportunity to present their position on sentencing, which the court took into account in determining the sentence.  Most important, the court explained its reasons on the record at the sentencing hearing, discussing the various sentencing factors set forth in 18 U.S.C. § 3553(a), and ultimately imposing a sentence of 108 months, which was below the 121-155 month advisory guidelines range and lower than the sentence the government requested.  (Oct. 24 Transcript at 56-63.)

### 4.  Restitution order

Fabian challenges the portion of this court's restitution order requiring that he pay $4,035,854.52 to Provident Bank, $3,625,500.28 to Wachovia Bank, and $213,769.80 to GS

Financial Network. (*See* Restitution Order, ECF No. 141.) He was never charged with defrauding those institutions, but in his plea agreement stipulated to having perpetrated a multi-million dollar fraud scheme against them. He argues that the Mandatory Victim Restitution Act (MVRA) did not authorize an order that Fabian pay restitution to those institutions. He also argues that the restitution order is illegal because it does not require the government to prove the amount of loss sustained by each victim, and because it does not expressly provide that if any of the $20 million in forfeiture is paid out to victims, the amount owed to those victims under the restitution order should be concomitantly reduced. (*See* Def.'s Mem. at 40.)

As stated above, Fabian has not shown "cause" for his failure to appeal, and therefore he is not entitled to collateral relief. *See Frady*, 456 U.S. at 168. Moreover, with respect to his challenges to the restitution order, there is another reason why Fabian is not entitled to collateral relief: 28 U.S.C. § 2255 only entitles prisoners to attack a custodial component of a sentence. Although the Fourth Circuit has not addressed the question, it appears that nearly every other Court of Appeals that has considered the question has concluded that restitution orders cannot be attacked through a § 2255 petition, including those filed when the defendant is incarcerated. *See Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009); *Kaminski v. United States*, 339 F.3d 84, 87 (2d Cir. 2003); *United States v. Bernard*, 351 F.3d 360, 361 (8th Cir. 2003); *United States v. Thiele*, 314 F.3d 399, 402 (9th Cir. 2002); *United States v. Hatten*, 167 F.3d 884, 887 (5th Cir. 1999); *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997); *Smullen v. United States*, 94 F.3d 20, 25-26 (1st Cir. 1996).[15] Those courts rely principally on the language of § 2255:

---

[15] The Sixth Circuit's treatment of the issue is "inconclusive." *Kaminski*, 339 F.3d at 88 n.2; *compare United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995) (rejecting a prisoner's challenge in a § 2255 motion to the imposition of a fine because "a monetary fine is not a sufficient restraint on liberty to meet the in custody requirement for § 2255 purposes") (alterations omitted) *with United States v. Weinberger*, 268 F.3d 346, 352 n.1, 355-359 (6th Cir. 2001) (considering a challenge to a restitution order, and reversing the order, under § 2255).

> A prisoner in custody under sentence of a court established by Act of Congress *claiming the right to be released* upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence

21 U.S.C. § 2255(a) (emphasis added).  Because the statute only authorizes courts to hear challenges to a conviction or sentence in which a prisoner "claim[s] the right to be released," "§ 2255 may not be used to bring collateral challenges addressed solely to noncustodial punishments." *Kaminski*, 339 F.3d at 87.  This rationale does not necessarily resolve, however, whether challenges to noncustodial punishments are "cognizable in a § 2255 petition when joined with challenges to custody." *Id.*  To address that question, courts rely on what has come to be known as the "congruence" rationale.  *See id.* at 89.  As the First Circuit has explained:

> A defendant, not in custody, sentenced to an allegedly erroneous fine or restitution order because of ineffective assistance of counsel cannot seek relief under § 2255 . . . , and therefore, it seems congruent that a petitioner who is given the same allegedly erroneous fine or restitution order but also happens, at the time he petitions, to be rightfully imprisoned also should not be able to challenge his monetary obligation in a collateral attack.

*Smullen*, 94 F.3d at 26; *see also Thiele*, 314 F.3d at 402 ("Non-cognizable claims do not morph into cognizable ones by osmosis.").  Following the lead of the courts cited above, the court concludes that a noncustodial component of a sentence, such as a restitution or forfeiture order, cannot be attacked in a § 2255 petition.  Therefore, Fabian's challenge to the restitution order fails.[16]

---

[16] The court does note, however, that even if Fabian were entitled to collateral review of the restitution order at this time, or if he had directly appealed, his claim would fail.  The MVRA authorizes, indeed requires, courts to order restitution "to persons other than the victim of the offense" "if agreed to by the parties in a plea agreement."  18 U.S.C. § 3663A(a)(3); *see United States v. Broughton-Jones*, 71 F.3d 1143, 1147 (4th Cir. 1995).  Although the language of the written plea agreement is ambiguous as to whether Fabian "agreed" to pay restitution to Provident, Wachovia and GS Financial Network, when deciding whether restitution to persons or entities other than the victims of the offense of conviction was "agreed to by the parties in a plea agreement" courts regularly look beyond the four corners of a written agreement, such as to the transcripts of plea and sentencing hearings, particularly if the written agreement is ambiguous.  *See, e.g.*, *United States v. Schrimsher*, 58 F.3d 608 (11th Cir. 1995); *United States v. Rice*,

### 5. Forfeiture order

Fabian also challenges a portion of the order of forfeiture, namely the order that Fabian "pay to the United States of America a money judgment of $20,000,000." (Order of Restitution and Forfeiture, ECF No. 159.) He argues the forfeiture money judgment is illegal because (1) it should have been limited to $2,033,600, the amount of the loss on Count 9, the mail fraud count to which he pled guilty; (2) the court did not follow the procedures described in Federal Rule of Criminal Procedure 32.2 in imposing the forfeiture order; and (3) the court "has not made any determination allowing a money judgment on substitute assets under [21 U.S.C.] § 853(p)." (Def.'s Mem. at 46.)

As above in the restitution context, most courts have concluded that § 2255 is not the proper vehicle for collaterally challenging noncustodial punishments. Although fewer courts have considered this question in the forfeiture context (and none in published cases, as far as the parties and the court have found), the reasoning of those cases leads to the same conclusion, namely that forfeiture orders cannot be challenged through § 2255. *See United States v. Banguera*, 1995 WL 449891, *1 (5th Cir. June 30, 1995); *Rodriguez v. United States*, 1997 WL 770636, *1 (1st Cir. Dec. 12, 1997); *Soldier v. United* States, 2009 WL 455830, *2 (D.N.D. Feb. 23, 2009); *Murphy v. United States*, 2009 WL 424490, *6 (N.D. Ill. Feb. 17, 2009); *United States v. Miller*, 2003 WL 24057592, *4 (N.D.N.Y. Aug. 18, 2003). Therefore, his challenge to the order of forfeiture fails.[17]

---

954 F.2d 40 (2d Cir. 1992). The circumstances surrounding the negotiation of the plea agreement, the Rule 11 hearing, the sentencing hearing, and the subsequent proceedings on restitution clearly demonstrate that the parties agreed Fabian would make restitution to those institutions. Moreover, the other grounds on which he challenges the restitution order would also fail: The MVRA itself entitles Fabian to have any funds forfeited to the government and restored to the victims to be applied to the restitution order. *See* 18 U.S.C. § 3663A(b)(1)(B), *United States v. Quillin*, 335 F.3d 219, 222 (3d Cir. 2003); *United States v. Smith*, 297 F. Supp. 2d 69, 72 (D.D.C. 2003). Finally, by failing to object to the dollar values of the losses stated in the government's motion for entry of a restitution order, Fabian agreed to the amount of restitution that he must pay to each of his victims.

[17] Furthermore, even if collateral review were available at this time, Fabian's claims would fail. First, Fabian pled

## E.      Claims of "actual innocence"

A court may grant habeas corpus or § 2255 relief, irrespective of procedural default, if the petitioner can show that he is "actually innocent" of the offense underlying his conviction or guilty plea, and therefore relief must be granted to prevent a "miscarriage of justice." *Murray v. Carrier*, 477 U.S. 478, 496 (1986); *see also United States v. Maybeck*, 23 F.3d 888, 893 (4th Cir. 1994). To establish actual innocence, a petitioner must show that his guilty plea "has probably resulted in the conviction of one who is actually innocent," *Bousley*, 523 U.S. at 623-624 (citation omitted), and must make that showing with "clear and convincing evidence" that was "not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 558-59 (1998). Moreover, "allegations in a § 2255 motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always palpably incredible and patently frivolous or false." *Lemaster,* 403 F.3d at 221 (internal quotation marks omitted). "[A] district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *Id.* at 222.

Fabian argues that he is "actually innocent" of mail fraud for two reasons. First, he argues that he is not guilty of "mail" fraud because the check Solarcom mailed to SPI on or about June 11, 2004, was mailed by FedEx, not by the U.S. Postal Service. The statement of facts to which Fabian agreed, however, stated that "on or about June 11, 2004, Solarcom mailed a check 10 SPI in Maryland in the amount of $2,033,600 for this hardware and software." (Plea Agmt. at

---

guilty and expressly agreed to forfeit all "right, title, and interest in any and all money, property, or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, *the Defendant's illegal activities*" (Plea Agmt. at 7 (emphasis added)), rendering appropriate a forfeiture order for an amount greater than the loss caused by his fraudulent conduct described in Count 9. Second, the procedures set forth in Rule 32.2 were followed, because an agreement related to the money judgment was not reached until "shortly before sentencing" (Affidavit of Sean Vitrano, Gov't Opp'n Ex. 1), and therefore it was "impractical" to enter the preliminary order of forfeiture in advance of sentencing. Third, 21 U.S.C. § 853(p) was also complied with because in imposing the preliminary order of forfeiture, the court concluded that "the $20 million that the defendant obtained as proceeds of the offense of conviction no longer exists as money proceeds." (Preliminary Forfeiture Order, ECF No. 116.)

15.)  Moreover, even if the check was sent by FedEx, the "use of the mails" element of mail fraud can be satisfied by showing that the defendant carried out the fraud by "deposit[ing] or caus[ing] to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier."  18 U.S.C. § 1341.  FedEx is a "private or commercial interstate carrier."  *See United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 248 (4th Cir. 2001), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).  That the superseding indictment charged Fabian with having sent the checks "by the United States Postal Service and by private and commercial interstate carrier" did not require the government to prove the checks were sent by both; rather, proving either type of mailing was sufficient.  *See United States v. Montgomery*, 262 F.3d 233, 242 (4th Cir. 2001).

Second, he argues that he is "actually innocent" of mail fraud that affects a financial institution because the "funding sources" listed in the statement of facts are not "financial institutions" as defined in 18 U.S.C. § 20.  (Def.'s Mem. at 33.)  The institutions that financed the fraudulent sale-leaseback transactions were wholly-owned subsidiaries of insured depository institutions, namely Key Bank and Fleet Bank.  (Gov't Opp'n at 19.)  The defrauding of a wholly-owned subsidiary of an insured depository institution, if it affects the parent corporation, may suffice to sustain a conviction for mail fraud affecting a financial institution.  *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (finding sufficient evidence to support a jury's verdict of wire fraud affecting a financial institution where the fraud was directed at a wholly-owned subsidiary and there was testimony that when the subsidiary suffered a financial loss as a result of the fraudulent scheme, the parent was affected by the loss); *see also United States v. Pelullo*, 964 F.2d 193, 215-16 (3d Cir. 1992) (reaching the same conclusion).

Fabian also argues that he is "actually innocent" of filing a false tax return. He argues that the proceeds received from the funding sources through Solarcom "were capital financing leases and not operating leases" and therefore were "nontaxable," and that any false statements he made were not willful. In his plea agreement, however, Fabian stipulated to facts that constituted a violation of 26 U.S.C. § 7206(1), and at the rearraignment Judge Bennett explained the elements of § 7206(1) and found that Fabian was "aware of the nature of the charges and the relevant consequences of his pleas of guilty and that his pleas of guilty on the advice of competent counsel with whose services he is satisfied are knowing and voluntary pleas supported by an independent basis in fact sustaining each of the essential elements of the offenses charged." (Plea Transcript at 44.) A plea of guilty and resulting judgment of conviction "comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." *Broce*, 488 U.S. at 569. Fabian has not shown with "clear and convincing evidence," *Calderon*, 523 U.S. at 558-59, that his guilty plea "has probably resulted in the conviction of one who is actually innocent." *See Bousley*, 523 U.S. at 623-624.

## CERTIFICATE OF APPEALABILITY

A prisoner seeking a motion to vacate under § 2255 is not automatically entitled to appeal a district court's denial of the motion. 28 U.S.C. § 2253(c)(1)(B). An appeal may only be taken from a final order in a proceeding under § 2255 if "a circuit justice or judge issues a certificate of appealability." *Id.*; *see also* Local Rule of the Fourth Circuit 22(b)(1) ("In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."). A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of

the denial of a constitutional right." *Id.* § 2253(c)(2). To make the necessary showing, a petitioner's burden depends on whether constitutional claims were rejected on the merits or on procedural grounds. If they were rejected on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). If the claims were rejected "on procedural grounds . . . without reaching the prisoner's underlying constitutional claim," the petitioner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As discussed above, for almost every one of Fabian's claims there are multiple alternative reasons, both procedural and substantive, why the claims fail. Fabian has not made the requisite showing for this court to issue a certificate of appealability.[18]

## **CONCLUSION**

For these reasons, "the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). No hearing is required, and the petition, along with the motions for summary judgment and discovery, and to appoint counsel, will be dismissed by separate Order.

| July 14, 2011 | /s/ |
|---|---|
| Date | Catherine C. Blake |
| | United States District Judge |

---

[18] Denial of a certificate of appealability in a district court, however, does not preclude a petitioner from seeking the issuance of a certificate in the Court of Appeals. *See* Local Rule of the Fourth Circuit 22(b)(1).